**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HYDROWORX INTERNATIONAL, INC., | : | Civil No. 1:25-CV-00689 |
| Plaintiff, | : | |
| v. | : | |
| ECHELON FITNESS MULTIMEDIA, LLC, | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

**MEMORANDUM**

This is a case about a trademark dispute, but the focus of the litigation currently is about the parties' efforts to settle this case. There are two motions currently pending before the court: a motion to enforce settlement agreement, filed by Plaintiff Hydroworx International, Inc. ("Hydroworx"), Doc. 38, and a motion to dismiss, or in the alternative to transfer venue, filed by Defendant Echelon Fitness Multimedia, LLC ("Echelon"), Doc. 37.[1] Because the court concludes that the parties entered into an enforceable settlement agreement on December 8, 2025, the court will grant the motion to enforce and deny as moot the motion to dismiss or transfer venue filed after the settlement was reached.

[1] Also pending is a motion for sanctions filed by Hydroworx. (Doc. 51.) The court will address that motion by separate order.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On April 21, 2025, Hydroworx filed a complaint against Echelon asserting a claim for trademark infringement pursuant to the Lanham Act, 15 U.S.C. § 1114(1), unfair competition pursuant to the Lanham Act, 15 U.S.C. § 1125(a), and state law claims for unfair competition and unjust enrichment. (Doc. 1.) In brief, Hydroworx claims that Echelon disregarded Hydroworx's federally registered trademark THRIVE® for hydrotherapy products by promoting, advertising, and offering for sale competing products, including hydrotherapy pools (cold plunges), compression boots, and a sauna blanket under the nearly identical mark THRIVEX. (*Id.* at p. 1, ¶¶ 15–18.)[2] Given the high degree of similarity in the marks and their use for identical or highly related products, Hydroworx contends that Echelon's use of the THRIVEX mark creates a high likelihood of confusion among common customers as to the source or sponsorship of its products or as to the relationship between the companies and has injured Hydroworx as a result. (*Id.* ¶¶ 19–21.)

After the complaint was filed, the parties filed consent motions in May and June, 2025, to extend Echelon's deadline to file a responsive pleading because the parties were engaging in settlement negotiations, which were granted by the court.[3]

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

[3] The court will address the facts regarding the parties' settlement negotiations in the discussion of Hydroworx's motion to enforce a settlement agreement below.

(Docs. 15, 16, 18, 19.) After the extended deadline expired, Hydroworx requested entry of a Clerk's default, which was granted on June 25, 2025. (Docs. 20, 22.) Echelon then moved to set aside the default, and the court granted that motion over the opposition of Hydroworx on November 5, 2025. (Docs. 23, 24, 25, 28, 29, 30.)

After the court set aside the entry of default, the parties filed three more consent motions to extend Echelon's time to respond in November and December of 2025, and January, 2026, all premised on the ongoing settlement negotiations between the parties, which were granted by the court. (Docs. 31–36.) In the December motion filed by Echelon's counsel, the basis for the extension was explained as follows: "The parties have since continued their settlement discussions and believe an agreement in principle has been reached. Therefore, Echelon requests a further extension of time to answer or otherwise respond to the Complaint in order that the Parties' settlement negotiations might conclude without the Court's intervention." (Doc. 33, pp. 1–2.) In the final consent motion filed by Echelon's counsel, the following basis for the extension was provided: "Echelon requests a further 7-day extension of time to answer or otherwise respond to the Complaint in order that the Parties may finally resolve this matter without the Court's intervention." (Doc. 35, p. 2.)

Surprisingly, after the above representations from Echelon's counsel in the filings in December and January about a settlement of this dispute, Echelon then

filed a motion to dismiss or, in the alternative, transfer venue, on January 16, 2026. (Doc. 37.) Three days later, Hydroworx filed a motion to enforce settlement agreement. (Doc. 38.) Observing that something appeared to have gone awry, the court convened a status conference on January 27, 2026. (Doc. 39.) The court's minutes reflect that counsel for Hydroworx expressed the view that the case was settled and then Echelon backed out of the agreement, while counsel for Echelon disagreed and said that the parties were merely close to settling the case. (Doc. 42 (court only).) The parties agreed to stay the briefing deadlines on the pending motions and try to finalize a settlement with the assistance of a Magistrate Judge. (*Id.*) The court entered orders reflecting the parties' agreement on the same date. (Docs. 44, 45.)

Magistrate Judge Susan E. Schwab held a settlement conference on April 14, 2026, and then notified this court that the case did not settle. (Docs. 48, 49 (court only).) The court then set a briefing schedule on the stayed motions to dismiss/transfer and enforce a settlement agreement. (Doc. 50.)

The parties have briefed the pending motions and they are ripe for resolution. (Docs. 37, 38, 53, 54, 63, 64, 66.)

## JURISDICTION

This action raises federal trademark and unfair competition claims as well as state law claims. The court has original jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1338, as well as 15 U.S.C. § 1121(a), and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## DISCUSSION

The court will address Hydroworx's motion to enforce a settlement first, because Hydroworx contends that the parties entered into a settlement agreement on either December 8, 2025, or January 5, 2026, at the latest, which precedes the date when Echelon filed their motion to dismiss or transfer venue. If the court grants Hydroworx's motion and concludes that the parties, in fact, settled the case before Echelon filed its motion, then Echelon's motion will be rendered moot.

### A. Hydroworx has established that the parties entered into a valid and enforceable settlement agreement on December 8, 2025.

Hydroworx argues that the parties agreed upon all material terms to settle this action on December 8, 2025, and then agreed to a formal, written document on January 5, 2026, which constitutes a valid, binding, and enforceable agreement to settle this case. Hydroworx contends that Echelon then reneged on that settlement agreement. Hydroworx now asks the court to enforce the settlement agreement. (*See* Doc. 38.) The court will first set forth the standard that applies when

reviewing a motion to enforce a settlement agreement, and then discuss the parties' arguments.

**1. Applicable standard for reviewing a motion to enforce a settlement agreement.**

At the outset, the court notes that "settlement agreements are encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by courts." *D.R. by M.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997). Because the "stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same"–both bringing the case to a close–in order to prevail on a motion to enforce a settlement agreement, the movant must demonstrate that there are no disputed material facts regarding the terms and existence of the settlement agreement. *Tiernan v. Devoe*, 923 F.2d 1024, 1031–32 (3d Cir. 1991). A court must treat all of non-movant's factual assertions as true, and the movant must demonstrate that there are no disputed material facts regarding the terms and existence of a settlement agreement.[4] *Id.*

As a general matter, a settlement agreement, when voluntarily entered, is "binding upon the parties, whether or not made in the presence of the court, and

[4] If material facts are in dispute, a court should not grant a motion to enforce a settlement agreement without holding an evidentiary hearing. However, no hearing is needed where there is no dispute as to the existence of the settlement. *Tiernan*, 923 F.2d at 1031.

even in the absence of a writing." *Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3d Cir. 1970). The validity and enforceability of a settlement agreement is governed by state contract law. *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009). Under Pennsylvania contract law,[5] "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–299 (3d Cir. 1986). The first question is factual, while the second is legal. *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 Fed. App'x 194, 200–201 (3d Cir. 2012).

First, in assessing whether the parties intended to be bound, the inquiry is objective: "If a party behaves in such a way that a reasonable person would apprehend that he intends to be bound by the terms of the agreement, that party's hidden subjective intent cannot overcome his outward manifestation of agreement." *Id.* at 201 (citing *Am. Eagle Outfitters*, 584 F.3d at 582.) Additionally, the absence of a signed writing is relevant, but not dispositive. If the parties agreed to the essential terms of a contract, then "the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent

---

[5] Both parties apply Pennsylvania contract law in their briefs, and the court does the same here.

enforcement of such agreement." *Id.* (quoting *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999)).

And second, in assessing whether the terms of the agreement are sufficiently definite to be enforced, the court must examine whether there are "ambiguities and undetermined matters which render [the] settlement agreement impossible to understand and enforce." *Mazzella*, 739 A.2d at 537 (internal quotation marks omitted); *Am. Eagle Outfitters*, 584 F.3d at 585. An agreement will not fail under this inquiry simply because there is some interpretive ambiguity, but it will fail for indefiniteness when it is "impossible to understand" what the parties agreed to because the essential terms are ambiguous or undefined. *Am. Eagle Outfitters*, 584 F.3d at 586.

**2. The undisputed material facts demonstrate that the parties entered into a valid and enforceable settlement agreement on December 8, 2025.**

Hydroworx has provided documentation in the form of a Declaration from Benjamin Simler, Esq., and numerous email chains and other documents in support of its argument that the parties agreed to the detailed and specific terms of a settlement agreement. (Docs. 41-1 through 41-9.) The court has carefully reviewed the supporting documents submitted by Hydroworx, as well as those

submitted by Echelon in response, Docs. 53-1 through 53-4, and makes the following factual findings about the settlement negotiations between the parties.[6]

After the complaint was filed, but before the parties began consenting to extend the deadline to respond, Echelon provided information to Hydroworx about Echelon's domestic and international sales of THRIVEX branded products. (Doc. 41-1, ¶¶ 7, 8.) On May 2, 2025, counsel for Echelon sent counsel for Hydroworx a file folder that contained, among other items, a spreadsheet showing sales of THRIVEX branded products. (Docs. 41-6, 41-9.) Following that exchange of information, on June 2, 2025, Hydroworx made a settlement demand to Echelon. (Doc. 53-1, ¶ 6; Doc. 53-4.) Counsel for Echelon then sent an email to counsel for Hydroworx on June 9, 2025, rejecting Hydroworx's settlement demand, but responding to various aspects of the demand in order to further settlement negotiations. (Doc. 41-7.) In this communication, counsel for Echelon stated: "Echelon has advised that it is unaware of any remaining product in its inventory bearing the THRIVEX mark . . . ." (*Id.*)[7] And then, on June 25, 2025, counsel for

---

[6] The facts material to the parties' settlement negotiation detailed here are undisputed. The court makes these factual findings based on the written submissions and without an evidentiary hearing because the court does not perceive any material factual dispute. *See Profit Point Tax Tech., Inc. v. DPAD Group, LLP*, No. 2:19-cv-698, 2024 WL 4436426, at *2 (W.D. Pa. Oct. 7, 2024) (citing *Tiernan v. Doe*, 923 F.2d 1024, 1031 (3d Cir. 1991)).

[7] Echelon submitted a different email thread from the same time period. (Doc. 53-3.) In that email thread, on June 13, 2025, counsel for Echelon again stated: "Echelon is unaware of any remaining products in its inventory bearing the THRIVEX mark, so this is a moot issue." (Doc. 53-3, p. 3.)

Echelon sent an email to counsel for Hydroworx proposing a set of settlement terms "which would need to be memorialized in a formal settlement agreement." (Doc. 41-8.) One of the twelve terms delineated by counsel was the following: "3. Echelon does not have any products in its inventory bearing the THRIVEX mark, so there is no need to liquidate any products, Echelon will represent and warrant this to be the case." (*Id.*) Another proposed term was: "8. Echelon will represent and warrant that the documents provided to Hydroworx are correct and account for all sales and distribution (including samples) of THRIVEX branded products." (*Id.*)

There is no assertion that the June 2025 settlement discussions resulted in a settlement agreement. Indeed, in an email exchange on August 12, 2025, counsel for Echelon identified a specific sticking point in settlement negotiations, and on August 14, 2025, indicated that no further settlement offer would be forthcoming from Echelon. (Doc. 41-2, pp. 13–14.)

Settlement discussions resumed on November 18, 2025, when counsel for Hydroworx contacted Echelon's counsel by phone. (*Id.* at 9–13; Doc. 53-1, ¶ 5.) The renewed settlement discussions culminated in an email from counsel for Hydroworx on November 26, 2025, detailing twelve terms of Echelon's settlement offer and stating: "If this is all correct, my client is prepared to accept your client's offer." (*Id.* at 8–9.) On December 5, 2025, counsel for Echelon responded to the

November 26 email with one concern raised by Echelon about the payment of certain fees. (*Id.* at 6.) On December 8, 2025, at 10:12 a.m., counsel for Hydroworx responded to the December 5 email and proposed a solution regarding the fees. (*Id.*) On December 8, 2025, at 2:48 p.m., counsel for Echelon responded: "Ben, we have an agreement. I assume you'll prepare the formal document(s)?" (*Id.* at 5.) Counsel for Hydroworx responded by email at 3:00 p.m., stating: "Yes; we'll get it to you as soon as your client approves. Can you prep a notice of settlement or whatever the court requires given your upcoming filing deadline?" (*Id.*) Counsel for Echelon then prepared and filed a consent motion to extend the responsive pleading deadline, advising the court that the parties were finalizing a settlement agreement. (*Id.* at 4–5; Doc. 33.) Specifically, counsel stated: "The parties have since continued their settlement discussions and believe an agreement in principle has been reached. Therefore, Echelon requests a further extension of time to answer or otherwise respond to the Complaint in order that the Parties' settlement negotiations might conclude without the Court's intervention." (Doc. 33, pp. 1–2.)

Counsel for Hydroworx then asked a clarifying question on December 9, 2025, in order to appropriately structure the assignment of trademark registrations as part of the settlement agreement documentation. (Doc. 41-2, p. 4.) Counsel for Hydroworx sent a proposed form of agreement along with an attached short form

assignment to counsel for Echelon on December 10, 2025. (Doc. 41-2, p. 3; Doc. 41-4.) Counsel for Echelon responded on December 18, 2025, stating: "Ben, please find attached a version of the settlement agreement with a few small edits, which my client has approved. We are agreed on the language of the assignment/schedule 1." (Doc. 41-2, p. 2; Doc. 41-5.) On January 5, 2026, at 11:42 a.m., counsel for Hydroworx responded: "We are good to go on the settlement with your changes. An executable copy is attached. I'm in the process of getting my client's signature with notarization for the assignment." (Doc. 41-2, pp. 1–2.) On the same date at 12:46 p.m., counsel for Echelon responded: "I'll send to my client for execution as well." (*Id.* at 1.) Again, on the same date at 1:31 p.m., counsel for Echelon sent by email a copy of the agreement signed by Hydroworx. (*Id.*)

The next day, on January 6, 2026, counsel for Echelon responded to advise that his client discovered that it had a quantity of products in its inventory bearing the THRIVEX brand, and proposed a change to the terms of the settlement agreement. (Doc. 41-3, p. 8.) Counsel for Hydroworx responded on the same day to advise Echelon's counsel that his predecessor counsel (from another law firm) had represented on June 9, 2025, that there was no remaining inventory with the THRIVEX mark, and offering certain suggestions about how to proceed. (*Id.* at 7.) From January 7 to 15, 2026, counsel for the parties had discussions by email about

a possible resolution of the issue raised by Echelon's discovery of the additional merchandise. (*Id.* at 2–6.) As well, counsel spoke by telephone on January 9, 2026, and counsel for Echelon confirmed that Echelon had approved the terms reflected in the emails and settlement agreement. (Doc. 41-1, ¶ 6.) Failing to agree upon a resolution of this late-discovered inventory issue, counsel for Hydroworx stated that he would file a motion to enforce the settlement agreement and counsel for Echelon indicated that he would file a motion to dismiss. (*Id.* at 1.)

Based on these factual findings, the court will now determine whether "both parties have manifested an intention to be bound by [the] terms and whether the terms are sufficiently definite to be specifically enforced." *Channel Home Ctrs.*, 795 F.2d at 298–299. Hydroworx contends that the parties manifested an intention to be bound by an agreement for the first time on December 8, 2025. (Doc. 41, pp. 8–10.) Based on the above factual findings, the court concludes that Hydroworx is correct. Following an exchange of information in May and June of 2025, and preliminary settlement negotiations from June to August, 2025, the parties failed to reach a settlement at that time. But then settlement negotiations resumed in November, and the parties had a thorough discussion of concrete settlement terms that were detailed in writing. Those discussions, as detailed in the above findings, culminated in counsel for Echelon telling counsel for Hydroworx that the parties "have an agreement." (Doc. 41-2, p. 5.) By express agreement of counsel, all that

was left to be done was to prepare the formal settlement documents and request a further extension of time from the court for the parties to finalize their settlement agreement. After counsel for Echelon confirmed in writing that there was an agreement, he then confirmed that fact to the court two days later on December 10, 2025, stating in the motion to extend time: "The parties have since continued their settlement discussions and believe an agreement in principle has been reached." (Doc. 33, pp. 1-2.)

This email exchange and the statement to the court make it abundantly clear that the parties reached an agreement that would be formalized in writing and had an intention to be bound by such agreement as demonstrated by their "'objective manifestations of assent'." *Cal. Sun Tanning USA, Inc. v. Elec. Beach, Inc.*, 369 Fed. App'x 340, 346–47 (3d Cir. 2010) (quoting *Espenshade v. Espenshade*, 729 A.2d 1239, 1243 (Pa. Super. Ct. 1999)). Where the parties have so clearly agreed on the essential terms, "'the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement.'" *Id.* at 347 (quoting *Mazzella v. Koken*, 739 A.2d 531, 536 (1999)).

Echelon protests that the parties did not intend to be bound by their agreement until a written agreement was signed. (Doc. 53, pp. 10, 13–15.) The court finds no evidence to support this factual assertion. There is no statement by either counsel in the record of the communications between counsel about the

settlement terms that even suggests that enforceability of the agreement would be contingent on the execution of a written agreement. *See Cal. Sun Tanning USA, Inc.*, 369 Fed. App'x at 347. Nonetheless, Echelon raises several points to support this argument, none of which persuade the court.

In sum, the court is persuaded by Hydroworx's undisputed evidence that the parties entered into an agreement and intended to be bound by such agreement on December 8, 2025. The court is not persuaded by any of Echelon's arguments to the contrary.

Further, the terms of the agreement were sufficiently definite to be enforced. The emails of counsel detailed the terms and the parties quickly prepared a written settlement agreement confirming those terms. (Docs. 41-2, 41-4, 41-5.) Thus, it is clear that there was no ambiguity in the terms that were agreed upon. The court concludes that the parties agreed to the essential terms of a settlement which were quite clear and definite on December 8, 2025.

And then, the parties proceeded to formalize their agreement in writing. Between December 9, 2025 and January 5, 2026, counsel for the parties worked together to draft, revise, and then finalize the written settlement agreement memorializing the terms that were agreed to on December 8, 2025. (Docs. 41-2, 41-4, 41-5.) Notably, the sole revision that was discussed between counsel related to the structure of the assignment of trademark registrations as part of the

settlement agreement documentation, which was certainly not a dispute regarding ambiguity in an essential term of the agreement. On January 5, 2026, both counsel confirmed by email that they approved the written settlement agreement and Hydroworx sent a signed copy to Echelon for counter-signature. (Doc. 41-2.)

Echelon next argues that the settlement agreement cannot be enforced because it was premised on a mutual mistake as to an essential fact. (Doc. 53, pp. 15–17.) Specifically, Echelon contends that the agreement required it to warrant that it had no remaining inventory of any goods bearing the THRIVEX mark, but it discovered on January 5, 2026, that it still had a small number of such items in its inventory. (*Id.* at 16.) Echelon maintains that the absence of inventory was an essential fact and it was a mistake. (*Id.*) Echelon contends that this mistake renders the agreement impossible to enforce, contending that it creates an ambiguity or undetermined matter. (*Id.* at 17.)

A mutual mistake can be grounds for rescinding or reforming a settlement agreement. *See Lanci v. Metropolitan Ins. Co.*, 564 A.2d 972, 974 (1989). However, Echelon's argument is unconvincing. That is because Echelon has not presented any proof of a *mutual* mistake. *See Timitskaya v. Petraglia*, 359 A.3d 1244, 2026 WL 1122315, *6 (Pa. Super. Ct. Apr. 4, 2026) ("Merely alleging a mutual mistake does not establish a mutual mistake existed at the time of the entry of the settlement agreement."); *Packard v. St. John of God Parish*, No. 07-cv-

0578, 2008 WL 73660, *2 (W.D. Pa. Jan. 7, 2008) ("To invalidate a solemn settlement agreement on the grounds of mutual mistake requires clear, precise, and indubitable evidence.") (citing *Felix v. Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943, 948 (Pa. Super. Ct. 2004) (additional citations omitted).

Here, the factual findings demonstrate that Echelon, through counsel, twice represented in June 2025 that it was unaware of any additional inventory bearing the THRIVEX mark. During settlement negotiations in November and December 2025, Echelon did not raise any question about remaining inventory. When counsel for Echelon stated "we have an agreement" on December 8, 2025, he gave no indication that there was any uncertainty about remaining inventory. The first notification from Echelon that there was remaining inventory was on January 6, 2026, after an agreement was reached, formalized in writing, and signed by Hydroworx.

There is no indication that Echelon's belated discovery of remaining inventory in its own possession was a mutual mistake; rather it was a unilateral failure by Echelon to check its inventory carefully before entering into a settlement agreement. Such a unilateral mistake is not a basis to rescind a settlement agreement. *See Holt v. Dep't of Pub. Welfare*, 678 A.2d 421, 423 (Pa. Commw. Ct. 1996) ("Mutual mistake exists where both parties to a contract are mistaken as to existing facts at the time of . . . execution."); *Berardi v. Drexel Univ.*, No. 13-cv-

7488, 2014 WL 2199423, *4 (E.D. Pa. May 27, 2014) ("If a mistake is unilateral and is not due to the fault of the party not mistaken but rather to the negligence of the party who acted under the mistake, the unilateral mistake affords no basis for rescinding or reforming the release.") (citing *CNA Ins. Grp. v. Nationwide Mut. Ins. Co.*, No. 98-1962, 2000 WL 288241, *9 (E.D. Pa. Mar. 8, 2000); *Smith v. Thomas Jefferson Univ. Hosp.*, 621 A.2d 1030, 1033 (Pa. Super. Ct. 1993)).

**3. Echelon is in breach of the settlement agreement and will be required to remedy the breach.**

Pursuant to the settlement agreement, Echelon was required to make payment and deliver countersigned documents to Hydroworx by January 20, 2026. (Doc. 41, p. 11.) Echelon was required to cease all use of the offending marks as of the effective date of the agreement, which was December 8, 2025. (*Id.*) And, Echelon represented that as of December 8, 2025, it had no remaining goods in its inventory, on order, in production, or in transit bearing THRIVEX or any other THRIVE-formative mark, and that prior representations it made were accurate and complete. (*Id.* at 11–12.) Rather than effectuating the terms of the settlement agreement, Echelon took the position that there was no agreement.

Because the court has concluded that there was a valid and binding settlement agreement on December 8, 2025, the court will order Echelon to

specifically perform pursuant to the terms of the agreement. The implementing order will detail the actions required by Echelon.[8]

**B. Echelon's Motion to Dismiss or Transfer Venue is Moot In light of the Parties' Settlement Agreement Entered into Prior to the Filing of That Motion.**

On January 16, 2026, Echelon filed a motion to dismiss, or in the alternative to transfer venue. (Doc. 37.) The court has concluded that the parties had a valid and enforceable settlement agreement as of December 8, 2025. The court will, therefore, deny the motion to transfer or dismiss as moot.

## CONCLUSION

For the reasons stated above, Hydroworx's motion to enforce a settlement agreement will be granted and Echelon's motion to transfer or dismiss will be denied as moot. An implementing order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: September 29, 2026

[8] The court will grant the relief requested by Hydroworx in part. The court will not require an accounting of infringing goods from April 25, 2025, but rather from December 8, 2025. And, the court will not require Echelon to pay Hydroworx all *revenues* from the sale of infringing goods from December 8, 2025 to date, but rather only the *profit* from such sales.